UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X
UNITED STATES OF AMERICA

               Plaintiff                             CRIMINAL DOCKET NO:
                                                           11-742 (CBA)

      v.

EMMA POROGER, D.O.

               Defendant
------------------------------------------------------------------------X

**Defendant's Submission Regarding the Loss Calculation**

        The significance of the amount claimed as loss and attributed to the fraud is obvious with its sentencing implications, particularly since there was such a clear and marked significant difference between the amount <u>billed</u> Medicare and the amount that Medicare paid; from approximately $13 million to approximately $4.4 million, nearly a 70% difference.  The reasons for this substantial difference will become clear and the amount attributable to Dr. Poroger, as will be shown, would be even significantly less. Dr. Poroger did not enter the practice with any plan or intent to commit a crime or to create or participate in a scheme to defraud Medicare; nor did she then have knowledge of an ongoing one.  Only later did she become aware of fraudulent activity (3/28/12 p 33, ℓ 13-22; transcript 5/2/12 p 26, ℓ 2; p 27 ℓ 5-6) committed by those higher up in the chain (transcript 3/28/12 p 40 ℓ 22).  Dr Poroger did not have access to all remittance statements as computer access was deliberately limited and blocked (transcript 3/28/12 p 33 ℓ 33) preventing her checking (transcript 3/28/12 p 35 ℓ 25; p 35 ℓ 1-10).  Dr. Poroger discovered during recent discussions that without her knowledge or authorization the

1

"management company" altered her correct codes and information and added multiple items, procedures and tests that were either unnecessary or never performed, including Doppler tests (monitoring internal blood pressure) sleep studies, and "unbundling" of certain codes to bill separately for tests already included; such as EEG's or simply billing out of whole cloth and gratuitously adding such items as EDTA, B-12 injections, vitamin infusions and many other billed codes and even forging her signature and, although not a physician, "ordering" EKG studies; but that does not excuse her involvement.

It should be noted that even newly adopted USSG § 2B1.(1)(b) 8 Amendment to the Guidelines pertaining to intended loss, effective after 11/1/11 (the fraud here is from November 2006 – March 2009), indicates only that the aggregate dollar amount of fraudulent bills submitted to the Government Health Care Program shall constitute prima facie evidence of the amount of the intended loss, i.e. "is evidence sufficient to establish the amount of the intended loss, <u>if not rebutted</u>." It does not constitute conclusive evidence. The special rule includes language making clear that the government's proof of the intended loss may be rebutted by the Defendant[1]. In our Circumstances, prior to the Amendment, any presumption would certainly be rebuttable as well. It is clear Dr. Poroger was aware of the Medicare fee schedule, knew these patients were all Medicare and the amount Medicare would pay for these patients and that all codes were subject to the fixed fee schedule (See attached letter).

The amount billed can be considered prima facie evidence of the defendant's intent to cause fraud, however, as seen, this is not conclusive. Under the United States

---

[1] Loss Primer (§2B1.1(b)(1)) Prepared by the Office of General Counsel U.S. Sentencing Commission, March 2012

Sentencing Commission, *Federal Health Care Offenses Involving Government Health Care Programs* §2B1.1 comment (n. 3(F)(viii)). *"fraudulent bills submitted to the Government health care program shall constitute prima facie evidence of the amount of the intended loss i.e. Is evidence sufficient to establish the amount of the intended loss, <u>if not rebutted.</u>"* In interpreting what is appropriate to rebut the prima facie evidence, the Court in <u>United States v. Miller</u>, 316 F.3d 495 (4th Cir. 2003) goes on to state that each case should be a case by case inquiry and each is fact specific. With reference to Medicare it is well recognized by both physicians and patients that Medicare reimburses its providers, as Dr. Poroger, only a fixed or "capped" amount in accordance with their established fee schedules, regardless of the amount billed.

Underlying Circumstances

As discussed in Singh (<u>U.S. v. Arvinder Singh</u>, U.S. Court of Appeals for the 2nd Circuit 390 F3d 168 (2004)), a "superbill" was utilized there as well, where the standard codes would be listed to designate the medical services actually rendered. These codes were based, as here, on the American Medical Association's ("AMA") Physicians Current Procedure Terminology ("CPT codes") – but in our case were fraudulently altered. The Court therein indicated, "…it did not require a leap of logic to infer he would not be entirely reimbursed for his billing claims. Indeed it is common knowledge that Medicare and private insurers pay fixed rates for medical procedures" – citing <u>U.S. v. Nachamie</u>, 121 F. Supp 2d 285 (U.S. District Court, Southern District of New York (2000) and further "an inference can surely be drawn because of Singh's status as a physician…" that he was aware of the capped reimbursement, dependent only on the code utilized. Dr. Poroger, from prior practice was specifically well aware of Medicare's

3

use of their fixed fee schedule and "cap" dependent on the billing codes utilized– it is indeed common knowledge in the medical profession and particularly by doctors participating in the Medicare program – as Dr. Poroger was and had been previously. Dr. Poroger did not learn until years later, after meeting with the Government, that many additional codes for tests and procedures were simply added without basis and without her knowledge or authorization to her "superbill."

As discussed in our Sentencing Position and Memorandum (p. 14-16) the issues of determining intended loss in Medicare fraud cases, as involved in our situation, are not new and have been addressed previously. A case remarkably similar and analogous is U.S. v. Nachamie, 121 F. Supp 2d 285 (U.S. District Court, Southern District of New York (2000) also involving a conviction under U.S.C. § 1347 where the Court substantially reduced the amount of loss calculation on essentially identical issues and at one point even with agreement of the government who concurred it was overstated. The "billing company" in our instance deliberately worked in conjunction and in coordination with the "management company" to prevent Dr. Poroger from reviewing or having access to or learning about the fraudulent remittance statements, which Dr. Poroger had no knowledge of – including those billing for such tests and treatment as EDTA, EEG, multiple Doppler studies, sleep studies and EKG's.

As here, naïve doctors were sought and recruited and it was determined that "the intended loss figure is the capped amount that Medicare pays per procedure code, reduced by 20%. The amount should be further reduced by the amount of any duplicate billing - …bills that were subsequently submitted again for payment" – resubmitted bills. There too, none of the doctors entered the scheme with criminal intent and there were

deliberate efforts to keep them from learning its details. The Court specifically commented in footnotes 6 and 7 "it is common knowledge that Medicare and private insurers pay fixed rates for medical procedures. None the less legitimate medical providers continue to bill at their usual rates, despite fee "caps" uniformly fixing reimbursement rates. The Defendants were experienced physicians… they must have known, as most patients know, that Medicare and other insurers pay fixed rates despite the fact that the amounts billed are routinely higher than the amounts paid." Incidentally, the Government in <u>Nachamie</u> "…has agreed that the loss figure should be reduced by the 20% co-pay ordinarily paid by the patient (footnote 7). Similarly, resubmissions and legitimate and non-fraudulent care also warrant reduction, as do services that were not reimbursed at all.

Loss Calculation

There are two numbers that are in agreement; the total billed amount 1) $13 million and the amount received 2) $4.4 million dollars. <u>Participating</u> providers in Medicare, which Dr. Poroger is, in order to accept assignment, i.e. to be paid directly, must agree to accept the approved charge as the full charge less the applicable deductible. In other words, every medical service, test and procedure is reimbursed by Medicare at only a fixed amount, determined by Medicare and their established fee schedules and "capped" at that fixed amount. What is utilized for payment are the widely accepted specific codes as set out in the CPT guide book where each code represents a test or procedure or office visit and has a designated fixed value assigned to it by Medicare – only that amount is paid, regardless of what amount is billed – whether more or less. For example, utilizing the diagram in the initial indictment, illustrating EDTA (an added

substance to supposedly reduce cholesterol), sleep studies and EEG (electro encephalogram – measuring brain waves).

| CODE | DESCRIPTION | BILLED | ALLOWED | PAID | |
|---|---|---|---|---|---|
| J3520 | EDTA | 50 | 0 | 0 | Not a covered service as Dr. Poroger knew An improperly added code to Dr. Poroger's notations |
| 95810 | Sleep Study | 1500 | 802 | 641 | |
| 95957 | EEG | 500 | 171 | 137 | This is included in the sleep study and was added without Dr. Poroger's knowledge or authorization |

Other examples of improperly added and altered billing unknown to Dr. Poroger and unauthorized, include B12 injections (vitamin), billed at 20 dollars but reimbursed at 25 cents and paid at 20 cents; EKG (electro cardiograms) billed at 50 dollars, 27 is allowed and 21 paid.

There were also as best as we can determine approximately more than 3 million dollars in resubmissions, where billing is included more than once that should be deducted and similarly non payment for items as EDTA merely added on paper and for such items as multiple vitamins also require substantial reductions - further reducing the amount of loss. Substantial adjustment based on the allowed and limited fee schedule, the fixed or capped amount coupled with the further 20% deduction to reach the Medicare paid amount and places us at the 4.4 million amount. To this number we must consider and deduct the legitimate, non fraudulent services and tests as well.

The amount of legitimate and non-fraudulent services is difficult to estimate because of the additions and alterations of tests and procedures, simply improper adding to legitimate billing. For example, if Dr. Poroger would appropriately order one Doppler (blood pressure study) two or three additional studies would be arbitrarily added by

6

merely using additional codes written in by the management company without Dr. Poroger's knowledge or authorization – just additional notation of "codes", added in the materials the management company would send to the billing company and not indicated by Dr. Poroger. The altered material would be electronically forwarded to Medicare.

The amount Medicare reimbursed for appropriate – non-fraudulent care, visits and examinations by Dr. Poroger is estimated about $2.6 million over two and a half years – and allowing for appropriate visits and examinations and for appropriate non-fraudulent tests. The remaining number should be <u>less than one million</u>.

However, another simpler approach is to determine the amount based on the time from when Dr. Poroger realized there was fraud occurring, although not aware of the specific codes that were added. It's clear she did not report it, notify Medicare, investigate further or leave – as indicated in her Allocution of May 2, 2012. As far as we can tell, from September 2008 when Dr. Poroger discovered the improper EKG – ordered by the non-physician management company, and was advised she was being impersonated and realized there was fraud going on until March 2009 when all new billing stopped, there was a total actual payment of $757,000 derived from the allowed fixed fee schedule, the capped amount. This substantially reduces the loss and its effect on the applicable guidelines placing it at a significantly different and much lower level.

Respectfully submitted

*[signature]*

Nathan L. Dembin

Dated: October 12, 2012

New York, New York

7